# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2701-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

A.P.,

     Defendant,

and

D.S-R.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.L.P.S.,
a minor.

_____

Submitted January 23, 2024 – Decided February 21, 2024

Before Judges Whipple, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0040-22.

Joseph E. Krakora, Public Defender, attorney for appellant (Christine Olexa Saginor, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

This is an appeal from the entry of an order of guardianship. Defendant, D.S.-R., appeals from the trial court's decision of April 18, 2023, terminating his parental rights to his daughter, S.L.P.S. S.L.P.S.'s mother, A.P., executed an identified surrender of her parental rights so that S.L.P.S.'s resource parents could adopt and is not a party to this appeal. A.P. and D.S.-R. have two older children who are not part of this litigation. We affirm.

This family first came to the attention of the Division of Child Protection and Permanency (Division) in 2019, due to allegations D.S.-R. physically abused his then-two-year-old son. A few months later, the Division became

2

A-2701-22

involved with the family again, after S.L.P.S.'s premature birth at home. S.L.P.S. was placed in the neo-natal intensive care unit due to numerous health concerns. Additionally, emergency services alerted the Division the home appeared unsuitable for children. The Division investigators found it dirty and cluttered throughout, but after D.S.-R. agreed to clean it prior to S.L.P.S.'s discharge from the hospital, the home improved. Thus, the Division made findings of "not established" against D.S.-R. and A.P. for the allegations of neglect.

The family's case was reopened by the Division when S.L.P.S. was ready for discharge but the parents were unprepared to manage her medical needs. The parents only visited S.L.P.S. eight to ten times in the three months she had been in the hospital, did not know how to feed the child and neither was trained to run the sleep apnea machine S.L.P.S. would need.

The court granted the Division custody of S.L.P.S. and ordered her parents to attend hospital trainings and comply with Family Preservation Services (FPS) in-home services. Further, the Division ordered D.S.-R. to complete a substance abuse evaluation. Due to her ongoing medical issues, S.L.P.S. was not discharged and remained in the hospital.

A-2701-22

The Division never substantiated a finding of neglect due to abandonment of S.L.P.S. but continued to offer services to address the child welfare concerns that had led to her removal. In February 2020, the court dismissed the Division's Title-Nine claims and continued the case pursuant to N.J.S.A. 30:4C-12 as a family in need of services.

Over the following months, the Division implemented those services and coordinated with the hospital about S.L.P.S.'s needs. D.S.-R. and A.P. complied for seven weeks, after which FPS recommended their less-intensive Step-Down program to continue preparations for S.L.P.S.'s safe return. During this time, the parents visited S.L.P.S. weekly and learned to feed her. However, the court granted the Division the right to place S.L.P.S. in a resource home until the parents fully complied with the hospital's discharge recommendations. On February 14, 2020, S.L.P.S. was placed in an unrelated resource home where she remains.

The family began supervised visits immediately, but visits were put on hold at the start of the COVID-19 pandemic due to concerns for S.L.P.S.'s fragile health. The Division continued to provide the parents updates, pictures and videos of her. The caseworker tried to speak with the parents weekly, but they frequently did not answer their phone or return her voicemail messages.

Ultimately, the Step-Down program terminated the family from the program for non-compliance. In the summer of 2020, the Division arranged for video visits with S.L.P.S., but neither parent participated. Although in-person visits restarted in July 2020, the parents did not see S.L.P.S. until December. The parents went for month-long stretches of time without visiting. D.S.-R. did not complete a court-ordered substance abuse evaluation or comply with a parenting assessment, although he was aware of the requirement.

Permanency goals of reunification were extended several times. D.S.-R. attended a parenting risk assessment which recommended services—psychiatric and substance abuse evaluations, individual counseling, parenting skills training, and FPS. D.S.-R. reported attending mental health services, but he never signed releases for the Division to confirm his compliance.

Genetic testing showed S.L.P.S. had a gene-related disorder requiring follow-up care with a neurologist or neurodevelopmental pediatrician and a hematologist. The disorder also required continued care with a cardiologist, audiologist, and ophthalmologist. Further testing was postponed multiple times, to S.L.P.S.'s detriment, because the parents delayed signing the consent forms.

D.S.-R. did not participate in any follow-up planning for S.L.P.S.'s medical needs and did not visit consistently even when the court allowed

5

unsupervised visits starting in summer 2021. The court reinstated supervised visits because D.S.-R. still had not engaged in training to learn how to manage S.L.P.S.'s medical needs should an emergency arise while he was caring for her.

On January 27, 2022, the court changed the permanency plan to adoption. D.S.-R. did not attend this hearing, and the caseworker met with him the next day to update him on the case and encourage his participation in services. The Division assessed all relative placements for S.L.P.S. provided by the parents and proactively looked for relatives the parents did not provide. All were ruled out for cause or were not interested in caring for S.L.P.S.

In March 2022, the case proceeded to guardianship. When the Division attempted to serve the parents, the apartment was vacant and staff at the leasing office reported the family was evicted for nonpayment of rent. D.S.-R. received the emails from the Division but did not respond until August 13, 2022. The Division worker advised him of the proceeding, provided a 5A form, and asked to meet with him. The Division had no further contact with him until December 2022, when the Division reached him by phone. A.P. left D.S.-R. after a domestic violence incident for which she received a temporary restraining order.

A-2701-22

D.S.-R. had recently been released from an inpatient substance abuse treatment program for using synthetic marijuana.[1]

On December 6, 2022, A.P. executed an identified surrender of her parental rights so the resource parents could adopt S.L.P.S., and A.P. was dismissed from the litigation. A.P. told her attorney D.S.-R. was arrested that weekend. The court was able to produce him to appear in the guardianship litigation. D.S.-R. was released from jail on December 12, but did not respond to the Division's outreach for two more weeks. D.S.-R. never visited with S.L.P.S. during the guardianship litigation and was homeless during this time.

He did not attend individual therapy, a psychiatric evaluation, nor parenting classes arranged by the Division. Neither did he attend a substance abuse evaluation until a month before trial, at which time he asserted he received services elsewhere. As of trial, the Division had not received confirmation regarding the services D.S.-R. claimed he received.

The guardianship trial was held on February 16 and March 2, 2023. The law guardian supported termination of parental rights. Because S.L.P.S. became

---

[1] The Division received referrals on September 15 and October 3, 2022, alleging concerns for the parents' care of the older children. On October 26, the Division emergently removed those children and placed them with S.L.P.S.'s resource parents after A.P. attempted suicide and was hospitalized.

hysterical and refused to interact with D.S.-R. at their bonding evaluation, the Division could not complete the evaluation and the court barred the defense from pursuing a bonding evaluation to prevent further traumatization of S.L.P.S. The court heard testimony from the family's caseworker, about the Division's involvement with the family, which the judge found credible. The caseworker testified about efforts to implement services for D.S.-R. and that—other than the original psychological evaluation—he did not engage with any recommended or court-ordered services, failed to visit S.L.P.S. consistently, and never learned how to manage S.L.P.S.'s significant medical needs.

The judge also heard testimony from the Division adoption worker, which the judge deemed credible. The adoption worker testified about the Division's involvement with the family since S.L.P.S.'s case was transferred to the adoption unit. She confirmed that between March and December 2022, D.S.-R. made no contact with the Division about S.L.P.S., despite multiple outreach efforts. She also confirmed the Division had referred D.S.-R. for all recommended and court-ordered services—substance abuse evaluation, parenting skills training, individual therapy, and psychiatric and psychological evaluations—but he had not attended any except the incomplete substance abuse assessment a month before trial and the psychological evaluation a week before trial. D.S.-R. did

finally provide a release on January 27, 2023, for rehabilitative services from September 2022, and the Division received records the week before trial. The adoption worker testified that although D.S.-R. was entitled to twice-weekly visits with S.L.P.S. he had not seen her since March 2022. The adoption worker also testified D.S.-R. had not provided either a plan for S.L.P.S.'s long-term care or any additional relatives as possible placements.

Due to S.L.P.S.'s medical conditions, the adoption worker confirmed she would need ongoing medical oversight by team of doctors, as well as continued monitoring of her genetic disorder. Additionally, the resource parents were successfully providing for S.L.P.S.'s emotional, physical, and medical needs. The resource parents told the Division they wished to adopt her.

The court also heard the testimony of Alison Strasser Winston, Ph.D., an expert in forensic psychology who evaluated the family. Dr. Winston questioned D.S.-R.'s ability to safely parent because his suspiciousness and fear of rejection would keep him from seeking help with parenting challenges and his hostility could lead him to "displace his frustration onto a child." Similarly, his stress and feeling of being overwhelmed, combined with his poor coping skills and verbally aggressive tendencies, could cause him to be aggressive towards a child.

A-2701-22

After the psychological evaluation, Dr. Winston attempted to conduct a bonding evaluation between D.S.-R. and S.L.P.S. but she cried, clung to her resource grandparent, and refused to engage. After about fifteen minutes, Dr. Winston stopped the evaluation because it was too traumatizing to S.L.P.S.

During Dr. Winston's bonding evaluation between S.L.P.S., her resource parents, and their two biological children, S.L.P.S. was comfortable, animated, and upbeat. Dr. Winston opined the resource parents were the people S.L.P.S. depended upon to consistently meet her needs and to provide her emotional support. S.L.P.S.'s secure attachment with her resource parents would "allow her to continue to flourish" if left in their care and removing her from their care would be "emotionally and developmentally devastating." Dr. Winston testified that S.L.P.S. should achieve permanency with her resource parents based on their three-year proven ability to provide her with the love, care, and stability she required. Dr. Winston opined D.S.-R. was an inconsistent presence in S.L.P.S.'s life and could not provide her with stability or permanency. As such, she opined D.S.-R.'s parental rights should be terminated, and that S.L.P.S. would suffer only minimal harm, which her resource family's love and security would mitigate.

10

Andrew P. Brown III, Ph.D., testified for D.S.-R. about psychological testing he administered and opined D.S.-R. needed lifelong psychiatric services for bipolar disorder. The testing also revealed depression, anxiety, and low self-esteem. According to Dr. Brown, the symptoms of bipolar disorder—inability to control anger, irritability, depression, mood swings, bad decision making, impulsivity, and irrational behaviors—can only be controlled with medication and treatment. Without such treatment, a person's ability to adequately parent is compromised. D.S.-R. reported to Dr. Brown he had stable employment, lived among relatives who would offer support, and would continue all S.L.P.S.'s current services and medical treatments, but D.S.-R. provided no independent proof of these facts. Dr. Brown opined D.S.-R. would be stable as long as he remained in treatment and endorsed gradual reunification with S.L.P.S. through therapeutic visitation. Dr. Brown did not opine on whether reunification—which would remove S.L.P.S.—was in her best interest.

D.S.-R. also testified. He discussed visits he had with his daughter and showed the court some photos from his phone.

On April 18, 2023, the court issued an oral opinion and determined the Division had proven by clear and convincing evidence all four prongs of the best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a), and terminated D.S.-R.'s

11

parental rights to S.L.P.S. The judge rejected Dr. Brown's opinion, finding his conclusion not credible because he was unfamiliar with the family's entire file. The court credited the evidence showing the resource parents had provided S.L.P.S. with all her medical care and were committed to adopting her despite being aware of kinship legal guardianship.

Under prong one of N.J.S.A. 30:4C-15.1(a), the court found by clear and convincing evidence that D.S.-R.'s failure to engage with services placed S.L.P.S. at an ongoing risk of harm. His inability to provide her with adequate care also caused her harm by delaying her permanency. Under the second prong, the court found D.S.-R. could not cease to inflict harm on S.L.P.S., because he did not remedy the circumstances that led to her removal despite the Division's attempts to provide services. The court found D.S.-R. unwilling or unable to eliminate the harm facing S.L.P.S. and there was no realistic likelihood he could safely care for her in the near future.

As for reasonable efforts, the court found the Division had referred D.S.-R. for extensive services to address the family's issues, meeting the first part of prong three. The second part of prong three was satisfied because the Division explored all reasonable alternatives to termination, including investigating relative placements, finding none were in S.L.P.S.'s best interest. Despite being

given ample support and time, D.S.-R. could not yet provide S.L.P.S. a safe and stable home. Instead, S.L.P.S.'s resource parents were willing to adopt her in order to continue providing her a loving, safe, and secure home. Thus, the court found the Division had established by clear and convincing evidence termination of D.S.-R.'s parental rights would not do S.L.P.S. more harm than good. The court entered a judgment of guardianship terminating D.S.-R.'s parental rights that same day. This appeal followed.

Our review of that decision is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We defer to the judge's expertise as a Family Part judge. Id. at 412-13. Additionally, we are bound by the Family Part judge's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). We conclude the factual findings are fully supported by the record and the legal conclusions drawn therefrom are unassailable.

D.S.-R. raises numerous arguments which we conclude lack merit. D.S.-R. argues evidence that termination was not in S.L.P.S.'s best interest was ignored, which necessitates a reversal of the order terminating his parental

A-2701-22

rights. However, based on our extensive review of the record, we conclude there is substantial, credible evidence to support the court's findings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2701-22